UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 13-74 (PJS/FLN)


UNITED STATES OF AMERICA,

                    Plaintiff,
                                                **GOVERNMENT'S TRIAL BRIEF**

        v.

MICHAEL ANTHONY SCHLEGEL,


                    Defendant.

        The United States of America, by and through its attorneys, John R. Marti, Acting

United States Attorney for the District of Minnesota, and Tracy L. Perzel and John

Kokkinen, Assistant United States Attorneys, hereby files the government's trial brief in

the above matter.

## I.      INTRODUCTION

        Michael Schlegel and Bradley Collin went off the grid in tax year 1994 and tax

year 1996, respectively, when they began failing to file U.S. individual income tax

returns.   Despite audits, sizeable tax assessments, and advice from legitimate tax

professionals, the two spent more than a decade concealing their income and assets from

the IRS and other potential creditors.  Like most white collar criminals, they were greedy.

They didn't want to pay taxes, sought out charlatans to tell them what they wanted to

hear about the tax system regardless of its basis in reality, and intentionally disregarded

the tax obligations applicable to them and every other American.  Rather than filing

individual income tax returns and paying their fair share of taxes, the defendant and

Collin conspired to thwart the IRS's collection and assessment efforts, filing nonsensical documents with the IRS, ignoring repeated requests for information, hiding behind nominee entities, shielding their assets by using a warehouse bank to conduct their financial transactions, and establishing trusts, such that the two could spend handsomely on themselves, their families, and their declining business while simultaneously and unlawfully shirking their tax obligations.

## II.    INDICTMENT

For the actions of the defendant and his coconspirator Collin, the grand jury charged them with conspiracy to impair and impede the IRS, failing to file tax returns for tax years 2006-2008, and further charged the defendant with tax evasion for the same tax years.   Coconspirator Collin has since pleaded guilty to Count 1 of the indictment, conspiracy to defraud the United States.

For Count 1, conspiracy to defraud the United States, the government must establish the following:

> *One*, in or before 2002, two [or more] persons reached an agreement or came to an understanding to defraud the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of income taxes;

> *Two*, the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

> *Three*, at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

*Four*, while the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did one or more of overt act within the statute of limitations for the purpose of carrying out or carrying forward the agreement or understanding.

18 U.S.C. § 371.

For Counts 2 through 4, attempting to evade or defeat tax for tax years 2006 through 2008, the government must establish the following:

*One*, the defendant owed substantial income tax;

*Two*, the defendant attempted to evade and defeat that tax; and

*Three*, the defendant acted willfully.

To "attempt to evade or defeat" a tax involves two things:  first, an intent to evade or defeat the tax; and second, some act willfully done in furtherance of such intent. So, the word "attempt" contemplates that the defendant knew and understood that, during the calendar years charged, he had some income which was taxable, and which he was required by law to report; but that he nevertheless attempted to evade or defeat all or a substantial portion of the tax on that income, by willfully failing to report all his known income which he knew he was required by law to state in his return for such year; or in some other way or manner.

To "evade and defeat" a tax means to escape paying a tax by means other than lawful avoidance.

Finally, for Counts 5 through 7, willful failure to file tax returns, the government must establish the following:

*One*, the defendant was required to file a federal income tax return for the 2006, 2007, and 2008 tax years;

*Two*, the defendant knew that he was required to file such a tax return; and

*Three*, the defendant willfully failed to file the required tax return on or before April 17, 2007, for the 2006 tax year; April 15, 2008, for the 2007 tax year; and April 15, 2009, for the 2008 tax year.

III.   **TRIAL**

The defendant intentionally cheated on his tax obligations for years.  And, even though the IRS had uncovered his cheating and had assessed him back taxes, interest, and penalties of more than $600,000.00, the defendant never paid it.  Instead, he used every means to delay, divert, stall, obstruct, confuse, and impede the work of the IRS in collecting this debt and in computing his tax obligations for subsequent years.

### A.  Tax Liabilities Assessed on The defendant and Collin in 2000 and 2004, Respectively.

The defendant and Collin have a long history of shirking their tax obligations.[1] First, they have each failed to file federal individual income tax returns since the early 1990s and, even when flush with cash, the two have intentionally declined to right their history of tax wrongs by reporting their income and paying the taxes they owe to the United States.  For the defendant this came to a head in 1998, when the IRS audited him and his wife for their individual income taxes.  IRS Revenue Agent Anna Johnson had little information on which to go, as she will testify at trial, as the defendant was uncooperative and obstructive as she attempted to identify his financial history.  Knowing the reality of his dismal tax situation, the defendant took steps to impair and impede the IRS audit process by inundating the agency with frivolous filings; advising third parties – contrary to law – that IRS summonses for the defendant's financial information were not

---

[1]  To the extent this history predates the conspiracy and is not identified in the indictment, the United States has provided notice, pursuant to Federal Rule of Evidence 404(b), that it seeks to offer evidence of these prior bad acts to establish the defendants' intent, plan, knowledge, and absence of mistake or accident.  Moreover, should the defendant claim he was acting in good faith in failing to comply with the tax laws, the United States will offer these prior bad acts to refute that claim.

lawful and, therefore, should not be complied with; and returning lawful mail from the IRS stamped "RETURNED FOR GOOD LEGAL REASON."  Despite the defendant's efforts to impair and impede, Agent Johnson persisted, obtained the necessary documents, and conducted a painstaking review of third-party records to include those of the "AA Schlegel Trust," which revealed the defendant's true financial picture.  He had substantial income, so much so, that he and his wife had purchased a residence for more than $800,000.00.  Through her efforts, Agent Johnson was able to prepare substitute tax returns for tax years 1994 through 1997, in essence identifying the defendant's tax liability for him because he refused to uphold his legal obligations to do so.  In 2000, and based on Agent Johnson's work, the defendant and his wife were assessed back taxes, interest and penalties for tax years 1994 to 1997, totaling more than $600,000.00.

Coconspirator Bradley Collin was not as savvy as the defendant but, like the defendant, stopped filing tax returns, three years after the defendant did so.  And, like they did for the defendant, the IRS – through IRS Revenue Agent Stephanie Zych – uncovered defendant Collin's true financial status and assessed him $80,000.00 in back taxes, interest and penalties in 2004 for tax year 2001.

### B. The defendant And Collin's Operation Of The Master's Miracle/NatureRich.

In 2002, the defendant and Collin joined in operating a multi-level marketing business they called The Master's Miracle.  The business sold personal wellness products and was, for a time, relatively successful.  Multi-level marketers – like the defendant and Collin – make money by securing distributors to sell their product and then having those

distributors secure others to sell the product.  The more distributors a person has under him or her, the more that person will profit.  Of course, those at the top of the distributor down-line hold the most lucrative position in the distributor food chain.  Here, the defendant and Collin stood at the top of long down-lines of distributors from whose sales they each profited, thereby reaping the benefits of their distributors' performance.  They paid themselves small salaries – in the mid $20,000s – but benefitted to a much greater degree through their commission payments with the defendant receiving more than $500,000.00 and Collin receiving more than $250,000.00

Not wanting to have the IRS or other creditors know of his substantial income, the defendant hid it from 2002 to 2008, by having TMM/NatureRich pay his commission checks to the Andrew James Living Trust (AJLT).  This was simply an alter ego of the defendant, a nominee entity for which he had opened multiple bank accounts and over which he and his wife had sole control.

TMM/NatureRich functioned well for a while, as its then-General Manager Steve Manske will testify, but ultimately required sizeable cash infusions from the defendant and Collin to pay its operating expenses.  Initially, these infusions were booked as loans from the defendant or Collin.  Later, the defendant told Manske to book the loans under the name Red Maple LLC.  Based on conversations with the defendant, Manske understood the entity to be that of the defendant and Collin.  The defendant told Manske that the money with which they were capitalizing TMM/Naturerich came from an investment.

6

### C. The defendant and Collin's Income from Horizon Establishment and Investors.

Defendant Schlegel and Collin had solicited investors and pooled investor funds for investment with Horizon Establishments.  All told, the defendant and Collin collected more than $5.2 million from investors based on their representations that investors would realize a substantial monthly rate of return (approximately five percent) in the relatively safe investment.  The defendant and Collin described the investment in various ways, oftentimes explaining that it involved lending to overseas banks where the investor's funds would be kept in bank accounts and leveraged more times than was lawful in the United States, to generate a high rate of return.  Once each investor decided to invest and provided their investment funds by check or wire transfer, the defendant and Collin deposited those funds into either a warehouse bank operated by a nominee entity in the State of Washington or another nominee bank account held in the name of Success by Design and located in Minnesota.

Under the guise of a "bookkeeping service," Olympic Business Systems (the warehouse bank), offered its clients banking anonymity, thwarted potential creditors including the IRS, and enabled its customers to avoid Bank Secrecy Act reporting requirements concerning suspicious or sizeable currency transactions.  The United States will present testimony concerning OBS, its organizer (R.A. a/k/a A.J.), and records recovered during execution of a search warrant at its bases of operations in the State of Washington.  In sum, the evidence will establish that the defendant and coconspirator Collin banked through OBS and did so using the nominee names of Maple Ridge and

Majestic Oaks.  The two deposited investor funds totaling $5.2 million, paid investors their investment return checks through OBS, and conducted their personal banking with OBS, oftentimes receiving by mail thousands of dollars in U.S. currency withdrawals from their warehouse bank accounts.  Of the $5.2 million in investor funds they collected, the defendant and his coconspirator Collin used $1.2 million for their own purposes to include paying the rent for their respective residences, their children's private school tuition, other personal expenses, and the necessary funds to infuse their ailing TMM/NatureRich with operating capital.  Ultimately, the investors were unable to recover their investment funds and, upon pursuing the defendant and Collin for answers, the investors were told that Horizon (Travis Correll) was to blame.[2]  Never did the defendant or Collin indicate that they were personally responsible for repaying the investors, such that the investment funds could be deemed loans – and, thus, not income – to the defendant and Collin.

At trial, the United States will call various investors to explain that their investment funds were solicited by the defendant and/or Collin and were not personal loans, gifts or inheritances to the defendant and Collin.  Specifically, investors will testify that (1) they provided the funds to the defendant and Collin based on the promises and representations the two – or their agents – made to the investors, and (2) the defendant

---

[2] This individual is Travis Correll.  Mr. Correll pleaded guilty in federal court in Georgia for operating a Ponzi scheme.  The United States cannot establish beyond a reasonable doubt that the defendant and Collin knew Correll was operating a scheme as the two collected funds from investors and made investment interest payments, and, therefore, will *not* identify the investment as a Ponzi scheme or attribute Mr. Correll's actions in operating a Ponzi scheme to them.

and Collin's *ex post facto* representations were consistent with the investors' understanding that the funds were for investment and were not personal loans, gifts or inheritances to the defendant or Collin. As a result, the defendant and Collin's personal use of these funds constituted accession to their wealth, and as such, the funds are taxable income to them.

### D.  The defendant Generates Additional Income From Painting.

In addition to their income derived from The Master's Miracle/NatureRich and the Horizon Establishment investors, the defendant and, to a lesser extent, Collin contracted to perform painting jobs as their time allowed. As to the defendant, he acted as a subcontractor to other contractors performing construction, decorating or remodeling work on various building projects. Those contractors paid the defendant for his painting or wall-papering services. At trial, the United States will present testimony from an owner and a bookkeeper of these contractors to establish this third source of the defendant's income as offset, of course, by expenses. For the defendant, his gross income totaled $400,000.00 for the tax years 2006 through 2008.

### E.  The defendant and Colin: "We Don't Have to Pay Taxes."

With their inner circle, the defendant and Collin shared their tax cheat mentality. For example, and through his work at the Master's Miracle, Manske learned that the defendant and Collin claimed they didn't have to pay income taxes. Of course, Manske knew this was not true, but at the request of his employers – the defendant and Collin – he accompanied them to a meeting where ways for cheating the tax system were discussed. Manske would have none of it. Yet, he believed in the company and its staff

and continued his work to properly operate it, which included complying with the law's requirements for reporting to the IRS income and commission payments for its employees and distributors. Manske even secured a well-respected tax firm to prepare and file the corporate tax returns. During this process, and upon a request from that firm for Red Maple's employer identification number, Manske learned from the defendant that Red Maple – which was eventually held out by the defendant and Collin as the largest shareholder of TMM/NatureRich – had no such number.

### F. The defendant and Collin Seek, for a Minute, to Return to the Tax System.

In 2004, the defendant and, later, Collin through the defendant, approached Doug Holm a certified public accountant with expertise in IRS offers and compromises. Holm had been a long-time employee of the IRS and had risen in the ranks to District Director of the Boise, Idaho office. At the age of 50, he retired and opened a small accounting firm with a focus on individuals who had significant tax problems. Initially, it appeared to Holm that the defendant and Collin truly desired to get back into the tax system, pay their tax obligations, and leave behind the selfish fiction that they could cheat the tax system. Holm's belief was short-lived in that Holm, through repeated requests for and review of records as well as conversations with the defendant and Collin, came to believe he was being misled, that information was being concealed from him, and that the two had no real interest in coming clean with the IRS. As Holm pushed for more information and eventually prepared a draft return for the defendant for tax year 2003 that stated the defendant's substantial tax liability, the defendant and Collin abruptly stopped using

Holm and secured the services of J.G.  Through J.G. – by letter – the defendant purported that he would work to get his tax issues resolved.  Of course, that never came to fruition.

In 2004, IRS Revenue Agent Stephanie Zych, who will testify at trial, was assigned to examine the corporate returns for TMM/NatureRich.  It is customary under such circumstances to request the individual income tax filings for a company's majority shareholders.  When Zych did so, she was met with unusual resistance.  Through TMM/NatureRich employee Tony Bangasser, who will testify at trial, the defendant asked Zych how she defined majority shareholder and then stonewalled her.  When Agent Zych and another IRS Revenue Agent arrived at the business on one occasion to meet with the defendant, he refused to meet with them.  For his part, Holm, when retained by the defendant, reached out to Zych to indicate that the defendant intended to file his tax returns.  Indeed, Holm knew that if the defendant did so, it was not likely to reach the point of a criminal investigation.  As previously explained, neither the defendant nor Collin filed any tax returns through Holm, halted their use of Holm, retained Green, and became the subjects of a criminal investigation by the IRS's Criminal Investigation Division.

### G. The defendant and Collin Persist in Impairing and Impeding the IRS to Their Personal Benefit.

For his part, and armed with the knowledge he gained from Agent Zych about majority shareholders, the defendant began filing corporate returns that both substantially minimized the extent of his and Collin's interest in TMM/NatureRich and identified the majority shareholder as Red Maple, the defendant and Collin's nominee entity.  Nothing

in these corporate returns revealed that Red Maple was really the defendant and Collin. Even a dogged IRS Agent would have been unable to connect Red Maple to the defendant and Collin, as the entity had been organized in the State of New Mexico by a nominee individual acting on behalf of the defendant and Collin.

As the defendant and Collin unlawfully worked year in and year out to impair and impede the IRS – to avoid paying the taxes each was assessed in the early 2000s and to avoid reporting and paying what they owed each year thereafter – the defendant and Collin channeled their ill-gotten gains to their personal benefit. They paid sizeable monthly rents for the residences in which they and their families lived. Of course, this was an outgrowth of their efforts to cheat the IRS and other creditors by not holding assets in their own names. They funded their children's private schooling among other personal expenses to include, for the defendant, $9,000.00 to a custom clothier. Most significantly, they capitalized TMM/NatureRich – the business for which they and much of their family worked – such that it would not fail, they would continue to receive their payroll and commission checks, and they could realize potential gains if the company's value appreciated.

When a United States grand jury investigating their tax cheating issued a subpoena to the records custodian of certain nominee entities, that subpoena was served on Collin. That subpoena expressly noted the investigative involvement of IRS-CID Special Agent Timothy Nichols. Collin failed to appear at the appointed time and day to testify, resulting in the issuance of an order to show cause and an arrest warrant. Once Collin was arrested, he was brought before the Court and later appeared before the grand jury.

When questioned before the grand jury on August 7, 2007, Collin refused to come clean, continuing the effort to benefit himself and the defendant by impairing and impeding the IRS, then at the criminal investigative level.  During his testimony, Collin falsely denied he was any of the nominee entities that he and/or the defendant had formed using nominee individuals – Success by Design, Big Sky Establishments, and Majestic Oaks, among others – and further falsely denied having any records relative to those entities.  A trash pull conducted by law enforcement at defendant Collin's residence two weeks after he testified revealed to the contrary, as Agent Nichols recovered documents addressed to Big Sky Establishments.

For the defendant, his unlawful and long-standing efforts to impair and impede the IRS were handsomely rewarded.  As federal law requires, once the 10-year period for collection authorized by statute expired, the $600,000.00 in back taxes, interest and penalties were wiped away.

## IV.   ANTICIPATED EVIDENTIARY AND LEGAL ISSUES DURING TRIAL.

### A.   The Government's Motion to Admit Evidence under Rule 404(b).

On December 30, 2013, the Government, out of an abundance of caution, has given notice (Dkt. 64) of its intent to introduce, pursuant to Federal Rule of Evidence 404(b), and moved in limine to admit evidence of other crimes, wrongs, or other acts of the defendant.  Specifically, the Government seeks to introduce evidence of two types of conduct: (1) the tax-filing histories of the defendant and Brad Collin, which show that both the defendant and Collin have not filed federal individual income tax returns since

the mid 1990s and (2) the defendant's use of tax cheat arguments in the late 1990s in response to the IRS's lawful – civil and criminal – efforts.

Rule 404(b) prohibits the admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). However, the Rule does not prohibit the admission of such evidence if offered for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* In addition, Rule 404(b) does not even apply if the other crimes, wrongs, or acts are "intrinsic to the charged offense . . . because such acts are not truly separate bad acts that show propensity, but are intrinsic evidence [that] is inextricably intertwined with the crime charged." *United States v. Maxwell*, 643 F.3d 1096, 1100 (8th Cir. 2011) (quotations omitted). "Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred. Such evidence is admitted because [it] completes the story or provides a total picture of the charged crime." *United States v. Brooks*, 715 F.3d 1069, 1076 (8th Cir. 2013) (quotation omitted). In the specific context of a conspiracy case, where the government "is required to prove the existence of an agreement between the conspirators . . . [t]he Government has considerable leeway in offering evidence of other offenses." *Maxwell*, 643 F.3d at 1100. (quotation omitted).

When other wrongful conduct does not qualify as "intrinsic," it is important to remember that Rule 404(b) still is "a rule of inclusion, permitting admission of such evidence unless it tends to prove only the defendant's criminal disposition." *United*

*States v. Adams*, 898 F.2d 1310, 1313 (8th Cir. 1989) (quoting *United States v. O'Connell*, 841 F.2d 1408, 1422 (8th Cir. 1988)). Further, "[w]here intent is an element of the crimes charged, evidence of other acts tending to establish that element is generally admissible." *Adams*, 898 F.2d at 1313. The trial court has broad discretion when deciding whether to admit or exclude prior bad act evidence. The Court may find that prior bad act evidence is admissible if it is (1) relevant to a material issue, (2) supported by sufficient evidence, (3) greater in probative value than prejudicial effect, and (4) similar in kind and not overly remote in time to the offense charged. *See United States v. Green*, 151 F.3d 1111, 1114 (8th Cir. 1998) (citing *United States v. Anderson*, 879 F.2d 369, 378 (8th Cir. 1989)).

        1.    <u>Tax-Filing Histories.</u>

At trial, the Government will offer evidence of the fact that the defendant has not filed an individual federal income tax return since 1994 and Colin has not filed since 1995. For the reasons discussed below, the tax-filing histories are properly viewed as intrinsic to the conspiracy charge. In the alternative, evidence of the tax-filing histories is admissible for one or more of Rule 404(b)'s permitted purposes.

This Court has previously ruled, and the Eighth Circuit affirmed, that a defendant's history of failing to file income tax returns is conduct that is intrinsic to a conspiracy to defraud the United States by impairing the functioning of the IRS. *See United States v. Maxwell*, 643 F.3d 1096, 1100-1102 (8th Cir. 2011). In *Maxwell*, the defendant was charged under 18 U.S.C. § 371 with conspiring to defraud the United States by impairing and obstructing the functioning of the IRS by assisting clients in

preparing and filing fraudulent tax returns. *Id.* at 1098. The government offered evidence at trial of the tax-filing histories of the defendant and his co-conspirators. *Id.* at 1099. At the charge conference, a question arose about whether the tax-filing histories amounted to "bad acts" covered by Rule 404(b), which would require inclusion of a limiting instruction in the jury instructions. *Id.* This Court concluded, and the parties agreed, that a 404(b) limiting instruction was not needed because the tax-filing histories were not truly "bad acts" evidence under Rule 404(b) but rather were intrinsic evidence about the conspiracy itself. *Id.*

On appeal, the Eighth Circuit affirmed, explaining that because a conspiracy requires the Government to prove the existence of "an agreement, voluntarily and intentionally reached, with the purpose of violating the law," evidence of the defendant's and his co-conspirators tax-filing histories tended to make the existence of the conspiracy more probable. *Id.* at 1100-01. Therefore, because evidence of the tax-filing histories was relevant, "via valid, non-propensity reasoning, to a material issue in the case . . . Rule 404(b) was inapplicable." *Id.* at 1101. Other courts have reached similar conclusions that tax-filing histories are intrinsic to a conspiracy to obstruct the functioning of the IRS. *See United States v. Jackson*, 33 F.3d 866, 873 (7th Cir. 1994) (evidence of a defendant's failure to file income tax returns was "necessary to understand and make sense of the activity underlying the conspiracy; the failure to file returns was, in other words, intricately connected with a conspiracy to impede and obstruct the IRS. It was not necessary, therefore, to subject its admission to a Rule 404(b) analysis."); *United States v. Hanes*, 336 F. App'x 690, 692 (9th Cir. 2009) (evidence of a co-conspirator's "early tax

delinquency and the events informing her decision to stop filing tax returns was admissible against [the defendant] because it was inextricably intertwined with the conspiracy between [the co-conspirator] and [the defendant] to defraud the IRS in subsequent years and necessary to provide a coherent and comprehensible story regarding the commission of the crime.") (quotations omitted). *But see United States v. Crim*, 451 F. App'x 196, 204-05 (3d Cir. 2011) (holding that the tax-filing histories of co-defendants in a conspiracy to defraud the United States by impairing and obstructing the IRS was not intrinsic to the conspiracy.)

Here, the defendant and Collin's failure to file tax returns since the mid-1990s is inextricably intertwined with the conspiracy charge. For example, one aspect of the conspiracy was to "thwart[] the collection of more than $600,000 in back taxes, interest and penalties levied in 2000 against the defendant and more than $80,000 in back taxes, interest, and penalties levied in 2004 against Collin." (Indictment [Docket No.1] ¶ 16.a.) The defendant's $600,000.00 assessment was based on income he earned in 1994, 1995, 1996, and 1997, all years for which he filed no tax return. Collin's $80,000.00 assessment was based on income he earned in 2001, a year for which he filed no tax return. To complete the story and make sense of the alleged conspiracy, the Government must introduce evidence as to how the assessments arose and that thwarting those assessments was a part of the conspiracy. In addition, the fact of the defendant and Collin's parallel conduct in failing to file tax returns supports the inference that they did indeed enter into a conspiracy, a purpose of which was to impair and obstruct the functioning of the IRS. In that regard, evidence of the tax-filing histories has a logical

tendency to prove one or more elements of the charged conspiracy, namely, the existence

of the conspiracy, one of its purpose, and the defendant's entrance into that conspiracy.

*See United States v. Luna*, 94 F.3d 1156, 1162 (8th Cir. 1996) (evidence of other

wrongful conduct is not governed by Rule 404(b) when it "tends logically to prove any

element of the crime charged").

Even if the Court were to conclude that the defendant and Collin's tax-filing

histories are not intrinsic to the conspiracy, evidence of the tax-filing histories is still

admissible under Rule 404(b) because it is offered for permissible purposes of

establishing motive, intent, preparation, plan, knowledge, and absence of mistake or

accident. *See Crim*, 451 F. App'x at 205 (holding that co-conspirators' tax-filing history

was admissible under Rule 404(b) because it was "certainly probative of [the co-

conspirators'] intent to defraud the Government and prevent the IRS from assessing and

collecting taxes on [their] clients . . . [and] was also admissible as proof of motive, intent,

plan or knowledge."); *United States v. Harris*, 200 F. App'x 472, 509 (6th Cir. 2006)

(holding that pre-conspiracy failures to file income tax returns and pay federal income

taxes was admissible under Rule 404(b)).

The defendant's tax-filing history is also admissible under Rule 404(b) with

respect to the charges of tax evasion and willful failure to file tax returns. *See United

States v. Bowman*, 602 F.2d 160, 163 (8th Cir. 1979) (holding in that evidence of non-

filing in each year was relevant in tax evasion case to the contested element of willfulness

in other years); *United States v. Ellett*, 278 F. App'x 82, 84-85 (2d Cir. 2008) (holding

that evidence of a defendant's federal tax history for years not charged in the indictment

18

is admissible under Federal Rules of Evidence 403 and 404(b) as circumstantial evidence of willfulness, an element of both tax evasion and willful failure to file tax returns) *United States v. Daraio*, 445 F.3d 253, 264 (3d Cir. 2006) (holding that "a defendant's past taxpaying record is admissible to prove willfulness circumstantially" in cases involving violations of federal tax laws);

The evidence to support the tax-filing histories will be sufficient, consisting of self-authenticating certified copies of IRS records showing that the defendant and Collin filed no returns for the years in question.  In addition, evidence of the defendant and Collin's non-filing of taxes is similar in kind to the crimes of conspiracy to obstruct the functioning of the IRS, and evidence of the defendant's non-filing is similar in kind to tax evasion and willful failure to file taxes.  Furthermore, the non-filing histories from 1994 to 2012 are close enough in time – and even overlap – the timeframes at issue in this case, specifically 2002 through 2010 for the conspiracy charge and 2006 through 2008 tax evasion and willful failure to file charges.  Courts have upheld the admission of 404(b) evidence that was far more remote.  *See United States v. Walker*, 470 F.3d 1271, 1274 (8th Cir. 2006) (upholding admission of 404(b) evidence relating to conduct that occurred 18 years ago); *United States v. Strong*, 415 F.3d 902, 905-06 (8th Cir. 2005) (upholding admission of 404(b) evidence of acts that occurred 16 years ago).

Lastly, the probative value of such evidence is greater than any prejudicial effect. The probative value is high because the issues of the existence of the conspiracy, the defendant's participation in that conspiracy, and the defendant's willfulness, are all issues that by their very nature tend to be proved circumstantially.  Any prejudicial effect can be

minimized by an instruction to the jury to consider the evidence of the tax-filing histories only for limited purposes. The Government has included such an instruction in its proposed jury instructions based on Section 2.08 of the Eighth Circuit Manual of Model Criminal Jury Instructions.

2.     The Defendant's Tax Protester Conduct.

The Government will offer evidence at trial of various tax protester materials that the defendant employed in response to correspondence and third-party summonses by the IRS in the late 1990s. This evidence is admissible because it is properly viewed as intrinsic to the alleged conspiracy. Alternatively, the evidence is admissible under Rule 404(b) because it will be offered for a valid, non-propensity purpose.

For the same reasons that the tax-filing histories are intrinsic to the conspiracy, the defendant's tax-protestor activities in the late 1990s are likewise intrinsic to the conspiracy. In particular, such evidence supports the inference that one purpose of the various manner and means and overt acts alleged in the conspiracy was to impair and obstruct the IRS. Thus, the evidence "tends logically to prove [an] element of the crime charged." *Luna* 94 F.3d at 1162. Evidence of the defendant having resorted to such activities is also necessary to provide background and context about the circumstances that lead to the alleged formation of the conspiracy and the defendant's participation in that conspiracy. As to the charges of tax evasion and willful failure to file tax returns, the evidence of the defendant's tax-protestor ideologies is proof of one of the very elements of those charges, willfulness. As such, it is intrinsic to those charges. *Cf. United States v. Hilgeford*, 7 F.3d 1340, 1344-1346 (7th Cir. 1993) (holding that a tax protestor's

"complicated and groundless" efforts to regain foreclosed property was evidence that his conduct was willful, a basic element of the charge of filing a false tax return, and thus was inextricably tied to the charge and was not subject to 404(b)).

Even if the Court were to conclude that the defendant's tax-protestor activities are not intrinsic to the charges against him, evidence of those activities is nonetheless admissible under Rule 404(b). The evidence is admissible for permissible purposes under Rule 404(b), including the defendant's intent and willfulness, knowledge, motive, and lack of mistake or accident. The Eighth Circuit has so ruled in several previous tax cases. *See United States v. Farber*, 630 F.2d 569, 571-72 (8th Cir. 1980) (citing *United States v. Luttrell*, 612 F.2d 396 (8th Cir. 1980) and *United States v. Bowman*, 602 F.2d 160 (8th Cir. 1979)). The evidence of tax-protestor conduct is relevant to the issue of willfulness, which is a material issue with respect to the charges of tax evasion and willful failure to file tax returns. It will be supported by sufficient evidence—the defendant's own statements in the form of correspondence sent to the IRS. The tax-protestor conduct is similar in kind to the charges, and it is reasonably close in time to the time-frame alleged in the Indictment. The evidence is highly probative of the defendant's intent and willfulness, any prejudicial affect can be minimized by an appropriate limiting instruction, and the government has proposed such a jury instruction based on Section 2.08 of the Eighth Circuit Manual of Model Criminal Jury Instructions.

**B. Summary/Expert Testimony and Evidence.**

The United States anticipates eliciting the testimony of two expert witnesses. First, Gary Mentz will testify that, in his capacity as an IRS Revenue Agent, he has analyzed the defendant's financial records and determined from that the defendant's income for tax years 2006 through 2008. Second, Susan Killingsworth will testify that, in her capacity as an IRS Revenue Agent, she has investigated the operation of warehouse banks and the purposes for using such entities. Further she is familiar with how such entities operate and the "privacy" protection they offer their clientele. This testimony is relevant and helpful to the jury in understanding the manner and means by which the defendant and Collin impaired and impeded the IRS as such a practice is outside the common understanding of most laypersons unfamiliar with the concept of warehouse banking. The United States herein and under separate cover provides written notice pursuant to Federal Rule of Criminal Procedure 16 for each of these expert witnesses.

With respect to Agent Mentz's anticipated testimony, federal courts have routinely recognized the admissibility of expert and summary testimony as to tax computations in criminal tax trials. See, e.g. *United States v. Gold*, 743 F.2d 800, 817 (11th Cir. 1984) ("[T]his court has expressly approved the use of expert legal testimony in a case where an IRS agent 'merely stated his opinion as an accountant with regard to the tax consequences of a transaction, and did not attempt to assume the role of the court'") (internal citations omitted).

In addition to expert testimony, the United States anticipates introducing summary charts and summary evidence pursuant to Fed. R. Evid. 1006. The United States provided

the defense notice of its intent to introduce summary evidence under Rule 1006 including

drafts of summary charts. Additionally, the United States provided the material

underlying the charts to the defense in discovery.

Fed. R. Evid. 1006 states:

The contents of voluminous writings, recordings, or photographs which cannot
conveniently be examined in court may be presented in the form of a chart,
summary, or calculation. The originals, or duplicates, shall be made available for
examination or copying, or both, by other parties at [a] reasonable time and place.
The court may order that they be produced in court.  The decision to admit
summary evidence is committed to the trial court's discretion and a decision to
admit summary evidence will only be overturned on appeal for abuse of
discretion.

*See, e.g., United States v. Richardson*, 233 F.3d 1285, 1293 (11th Cir. 2000).  Summary

charts may be based on documentary evidence, witness testimony, or both. See *United*

*States v. Gold,* 743 F.2d 800, 816 (11th Cir. 1984) (upholding admission of summary

exhibits containing information derived from "other exhibits received into evidence or

from oral testimony"). In this case, the information on the summary charts will be derived

from both documents and testimony.  The Government anticipates that all of the

underlying evidence will not only be admissible, but will in fact be admitted at trial. The

summary charts the Government intends to introduce will fairly and accurately

summarize voluminous bank records and tax records.  "Rule 1006 does not require that

'it be literally impossible to examine the underlying records' before a summary chart may

be introduced."  *United States v. Stephens*, 779 F.2d 232, 238 (5th Cir. 1985) (quoting

*United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1978).  Nor does the fact that the

underlying records may be already admitted into evidence mean that they could be

conveniently examined.  *See id.*  Because summary charts are themselves evidence under Rule 1006, the jury may be permitted to examine them in the jury room.  *See Stephens*, 779 F.2d at 238-39; *see also United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998). Furthermore, the charts the Government seeks to admit as summary evidence nevertheless constitute demonstrative aids.

**B.      Stipulations.**

The United States and the defense have agreed to the substance of stipulations that should allow for the expediting of the trial and will preclude the need to call records custodians and similar foundational witnesses for most items of evidence.

**C.      Presence of Summary Witnesses and Special Agent at Trial.**

Pursuant to Federal Rule of Evidence 615, the United States requests permission to have IRS-CID Special Agent Timothy Nichols and IRS Revenue Agent Gary Mentz in court during the proceedings.  Rule 615 provides, in relevant part, "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses."  Rule 615 "does not authorize exclusion of . . . an officer or employee of a party which is not a natural person designated as its representative by its attorney, or [] a person whose presence is shown by a party to be essential to the presentation of the party's case."  Both Special Agent Nichols and Revenue Agent Mentz are essential to the presentation of the prosecution's case. This request is well supported by law.  *See, e.g., United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982) (stating that a "case agent [is] clearly exempted" from the rule); *United States v. Cox*, 459 F.2d 986, 988 (5th Cir.

1972) (permitting a case agent to sit at counsel table during trial is a "virtually universal practice").  Revenue Agent Mentz's expert and summary testimony will, in part, rely on what occurs during the course of this trial, thus his presence in Court is essential to the presentation of the Government's case-in-chief.

### D.     Collin's Statements to the Grand Jury.

The Government will offer evidence of statements Collin made to the grand jury on August 7, 2007.  Specifically, the Government will introduce evidence that Collin made the following statements to the grand jury:

> [M]y name is Brad Collin.  I reside at 12373 – 63rd Street Northeast, Ostego, Minnesota, 55301.
>
> . . . .
>
> I am not Success By Design, LLC, Majestic Oaks, LLC, Genesis Systems, LLC or Big Sky Establishment, LLC.
>
> I am not the custodian of records of Success . . . By Design, LLC, Majestic Oaks, LLC, Genesis Systems, LLC or Big Sky Establishment, LLC.
>
> I have no documents relating to Success By Design, LLC, Majestic Oaks, LLC, Genesis Systems, LLC or Big Sky Establishments, LLC under my care, custody or control.

The above statements are admissible because they are not offered for the truth of the assertions.  To the contrary, the statements are offered because they are untruthful or at the very least misleading.  The evidence will show that Collin, the defendant, and others acting at their direction, created and controlled those entities and that Collin did in fact have documents relating to those entities in his control.  In that regard, the statements

are further evidence of the alleged conspiracy to impair and obstruct the functioning of the IRS and Collin's involvement in the conspiracy. *See United States v. Sabino*, 274 F.3d 1053, 1073 (6th Cir. 2001) (citing to a co-conspirator's false grand jury testimony, among other evidence, in concluding that conviction for conspiracy to defraud the United States by impairing and obstructing the functioning of the IRS was supported by sufficient evidence), *modified on other grounds by United States v. Sabino*, 307 F.3d 446 (6th Cir. 2002).

###     E.     Advice of Counsel Defense.

It is not yet clear whether the defendant is asserting a claim that he relied on the advice of counsel, and the government believes that the necessary predicate to assert such a claim is unavailable to the defendant. A defense of reliance on advice of counsel is available only if a defendant shows that (1) before taking action with regard to the alleged offense, the defendant in good faith consulted an attorney whom the defendant considered competent, (2) the defendant's consultation with the attorney was for the purpose of securing advice on the lawfulness of the defendant's possible future conduct, (3) the defendant made a full and accurate report to that attorney of all material facts known to the defendant, and (4) the defendant then acted strictly in accordance with the advice the attorney gave the defendant. Manual of Model Criminal Jury Instructions for the Eighth Circuit, § 9.09 (2013) (citing cases).

Because reliance on advice of counsel is available only if the necessary showing is made during trial, the defendant should not be permitted to refer to such a claim in opening statements, and the government moves *in limine* to preclude the defendant from

so doing.  *See United States v. King*, No. 3:06-cr-212-J-33MMH, 2006 WL 3490805, at

*13-14 (M.D. Fla. Dec. 1, 2006) (granting the government's pre-trial motion, which

sought to preclude argument in opening statement regarding reliance on advice of counsel

while still preserving the defendant's right to attempt to lay the predicate for such a

defense by presenting evidence during trial).  In addition, unless the necessary showing is

made during trial, the defendant should not be permitted to argue reliance on advice of

counsel in closing arguments, and the government will make any necessary motion to

preclude such argument at the appropriate time. *See United States v. Quinones*, 417 F.

App'x 65, 67 (2d Cir. 2011) (district court did not abuse its discretion in refusing to

permit defense counsel to argue advice of counsel defense during summation when the

factual predicate for such a defense had not been established).

### F.    Good Faith Defense.

The defendant should be permitted to advance the argument – if he so chooses –

that he had a good faith misunderstanding of the law.  In a criminal tax case in which

willfulness is an element of the offense, a defendant's conduct is not willful if he acted

pursuant to a good faith misunderstanding of the requirements of the law.  *United States*

*v. Morris*, 20 F.3d 1111, 1114 (11th Cir. 1994).  Willfulness, as defined by the Supreme

Court, connotes a "voluntary, intentional violation of a known legal duty." *See Cheek v.*

*United States*, 498 U.S. 192, 200-201 (1991).  A defendant asserting a good faith defense

is not required to have been objectively reasonable in his misunderstanding of his legal

duties or belief that he was in compliance with the law. *Cheek*, 498 U.S. at 202-203.

However, in applying a subjective standard, a jury may consider the reasonableness of

the defendant's asserted beliefs in determining whether the belief was honestly or genuinely held. *Id*. at 202- 04.   The Supreme Court, however, recognized that a *disagreement with the law* is not good faith.  *Id*. at 202, n. 8 (emphasis added).  And claims that the tax code is unconstitutional do not constitute good faith. *Id*. at 203.  Such claims "do not arise from innocent mistakes caused by the complexity of the Internal Revenue Code" but "reveal full knowledge of the provisions at issue and a studied conclusion." *Id*. at 205.  Accordingly, "a defendant's views about the validity of the tax statutes are irrelevant to the issue of willfulness and need not be heard by the jury, and, if they are, an instruction to disregard them would be proper." *Id*. at 206.

The significant evidentiary issue for the Court will be the extent to which, if any, the Court permits the defendant to introduce into evidence materials that contain incorrect statements of law or commentary on the law.  To be clear, the United States does not object to the defendant's testimony about reliance on particular materials provided proper foundation is established.  This requires foundation that the defendant actually relied upon the particular material during, or prior to, the alleged commission of the crime. *United States v. Marston*, 517 F.3d 996, 1003 (8th Cir. 2008); *United States v. Harris*, 942 F.2d 1125, 1132, n. 6 (7th Cir. 1991).

But admitting these materials into evidence is an altogether different matter. *See, e.g.*, *United States v. Gustafson*, 528 F.3d 587, 592 (8th Cir. 2008) (upholding, in tax case, exclusion of legal documents and purported legal opinions that the defendant said he relied upon on grounds that materials would be confusing and invade the province of the Court to instruct the jury on the law); *United States v. Simkanin*, 420 F.3d 397, 412

(5th Cir. 2005) ("[T]he district court must be permitted to prevent the defendant's alleged view of the law from confusing the jury as to the actual state of the law. . ."). Many courts have struck a reasonable balance in permitting the defendant to quote portions of third party materials if such materials are relevant to the issue of willfulness and if proper foundation is established. *See Gaumer*, 972 F.2d 723, 724-25 (6th Cir. 1992) (opining that defendant should be permitted to read relevant excerpts of reliance materials into the record. As with the official source material, however, it is not necessary for the Court to allow publication of legal authorities to the jury or offer them into evidence to rebut the government's evidence that he was willful. *See Simkanin*, 420 F.3d at 412; *see also United States v. Nash*, 175 F.3d 429, 436 (6th Cir. 1999) (affirming district court's refusal to physically admit certain reliance materials, where defendant was permitted to mention and quote from them); *Gaumer*, 972 F.2d at 725 (opining that trial court need not physically admit hundreds of pages of tax protest documents); *Willie*, 941 F.2d at 1395; *United States v. Hairston*, 819 F.2d 971, 973 (10th Cir. 1987) (holding that defendant's testimony, which included reading portions of tax protest materials, was more probative than the materials themselves). Moreover, although a jury may consider any evidence in determining whether the defendant truly believed that what he was doing was legal, the Court need not admit every piece of evidence the defendant offers. *See Willie*, 941 F.2d at 1394-95.

Finally, to the extent this Court admits any extrinsic evidence of this nature, such evidence should be admitted solely as to the defendant's state of mind and should be disregarded as a statement of law since it is an incorrect statement of law. *See, e.g.,*

*United States v. Ratfield*, 2009 WL 2502105 at *4-5 (11th Cir. 2009) (unpublished). In such an instance, a limiting instruction about the actual law would be appropriate.

Dated: December 30, 2013        Respectfully Submitted,

JOHN R. MARTI
Acting United States Attorney

*s/ Tracy L. Perzel*

*s/ John Kokkinen*

By: TRACY L. PERZEL
JOHN KOKKINEN
Assistant U.S. Attorney
Attorney ID Nos. 296326/388356